SH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Wellington Spencer Coppess,

               Plaintiff,

v.

Charles L. Ryan, et al.,

               Defendants.

No.  CV 18-00118-TUC-JAS

**ORDER**

Plaintiff Wellington Spencer Coppess, who is currently confined in Arizona State Prison Complex (ASPC) Santa Rita Unit in Tucson, Arizona, brought this civil rights case pursuant to 42 U.S.C. § 1983.  (Doc. 1.)  Defendants move for summary judgment, and Plaintiff opposes.[1]  (Docs. 42, 52.)

The Court will grant Defendants' Motion for Summary Judgment and terminate the action.

**I.      Background**

In his Complaint, Plaintiff sues Arizona Department of Corrections (ADC) Director Charles Ryan, Assistant Director Richard Pratt, Facility Health Administrator (FHA) Benjamin Schmid, and private healthcare provider Corizon Health, Inc. ("Corizon") in their official and individual capacities for denying him treatment for his Hepatitis C (HCV).  (Doc. 1.)  On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 43.)

stated an Eighth Amendment medical care claim against Defendants Ryan, Pratt, Schmid, and Corizon and directed them to answer.  (Doc. 8.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3). . . . .

III.    **Relevant Facts**

   A.    **ADC HCV Treatment Protocols**

Prison officials face several challenges when treating prisoners infected with HCV including budgetary constraints, the high cost of treatment, and the fact that incarcerated individuals are up to thirteen times more likely to have detectible levels of HCV in their blood than the general population. (Doc. 39 (Defs.' Statement of Facts) ¶ 35.) In light of these challenges, ADC and Corizon have adopted the BOP's Clinical Guidance manual for the Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection ("BOP Guidelines"). (*Id.* ¶ 36.)[2] The BOP Guidelines contain a comprehensive framework for prioritizing prisoners for HCV treatment so that prisoners with the greatest need are identified and treated first. (*Id.*)

According to the January 2018 BOP Guidelines, "[p]rogression of chronic HCV infection to fibrosis and cirrhosis may take years in some patients and decades in others— or, in some cases, may not occur at all. Most complications from HCV infection occur in people with cirrhosis." (Doc. 39-1 at 78 (Defs.' Ex. HH).) Therefore, "[a]ssessing for advanced fibrosis and cirrhosis is recommended for all inmates with HCV infection in order to select the most appropriate treatment regimen, prioritize inmates for treatment of HCV, and determine the need for additional health care interventions." (*Id.* at 79.) "Symptoms and signs that support the diagnosis of cirrhosis may include: Low albumin or platelets, elevated bilirubin or INR, ascites, esophageal varices, and hepatic encephalopathy." (*Id.*) But, "isolated lab abnormalities" such as these "may require additional diagnostic evaluation to determine the etiology." (*Id.*)

A "[l]iver biopsy is no longer required [for assessing liver fibrosis] unless otherwise clinically indicated or if there is uncertainty about the stage of fibrosis, based on results from non-invasive testing or other clinical indicators." (*Id.*) Instead, the AST-Platelet

---

[2] The ADC's adoption of the BOP Guidelines is memorialized in Appendix C, Section 2.0 of the ADC Health Services Technical Manual, *Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C*. (Doc. 39 ¶¶ 51, 52; Doc. 39-1 at 107–17 (Defs.' Ex. II).)

Ratio Index (APRI) is the BOP-preferred method for non-invasively assessing an individual's hepatic fibrosis and cirrhosis.  (*Id.*)[3]  The APRI score is calculated using the results of two blood tests, the AST and the platelet count, and is a less expensive and less invasive means of assessing liver fibrosis than a liver biopsy.  (Doc. 39 ¶ 41.)  The formula for calculating the APRI score is: [(AST/AST Upper Limit Normal) x 100] / platelet count.  (Doc. 39-1 at 79.)[4]  An APRI score of 2.0 or higher "may be used to predict the presence of cirrhosis."  (*Id.*)  Prisoners with an APRI score in this range "should have an abdominal ultrasound performed to identify other findings consistent with cirrhosis."  (*Id.*)  "Abdominal ultrasound is routinely performed in cases of known or suspected cirrhosis, and as clinically indicated on a case-by-case basis."  (*Id.*)  APRI scores may be inaccurate in patients who have undergone a splenectomy, so "[a]n alternative non-invasive test, e.g., Fibrosure, may be appropriate."  (*Id.* at 79, 111.)

According to the BOP Guidelines, prisoners with advanced hepatic fibrosis, prisoners who have undergone a liver transplant, and prisoners with certain comorbid medical conditions are classified as "high priority for treatment" (Priority Level 1).  (*Id.* at 81.)  Advanced hepatic fibrosis is demonstrated through either: (1) an APRI score of 2.0 or higher; (2) Metavir or Batts/Ludwig stage 3 or 4 on liver biopsy; or (3) known or suspected cirrhosis.  (*Id.*)

Prisoners who have an APRI score between 0.7 and 2.0 or who have stage 2 fibrosis, as determined by a liver biopsy, are considered "intermediate priority for treatment" (Priority Level 2).  (*Id.* at 82.)  Prisoners with certain comorbid conditions—including liver

---

[3] "AST" refers to aspartate transaminase, which "is an enzyme that is released when your liver or muscles are damaged."  *See* "Aspartate transaminase," *University of Rochester Medical Center Health Encyclopedia*, https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=aspartate_transaminase (last visited Sept. 17, 2019).  An AST test "is used to diagnose liver damage." (*Id.*)

[4] An APRI calculator is available at https://www.hepatitisc.uw.edu/page/clinical-calculators/apri (last visited Sept. 17, 2019).  An Upper Limit Normal of 40 is generally used to calculate an individual's APRI score.  (*See id.*)

disease, chronic kidney disease, HIV, Hepatitis B, and diabetes—are also classified as Priority Level 2.  (*Id.*)

Prisoners who have an APRI score less than 0.7 or who have stage 0 or 1 fibrosis on a liver biopsy are considered "low priority for treatment" (Priority Level 3).  (*Id.*)

Corizon provides direct-acting antiviral treatment to prisoners with HCV based on priority of treatment as outlined in the BOP Guidelines.  (Doc. 39 ¶ 60.)  In his declaration, Defendant Schmid asserts that the final decision on whether a prisoner receives HCV treatment "is made by the Hepatitis C Committee."  (Doc. 39-1 at 125 (Schmid Decl. ¶ 9).)  The decision to approve a prisoner for HCV treatment is based on several factors, including the prisoner's APRI score and individual medical needs.  (*Id.*)  ADC policy does not require all prisoners with HCV to undergo ultrasound screening every six months.  (*Id.* ¶ 10.)  "All needed testing is coordinated by the HCV Committee."  (*Id.*)

## B.    Plaintiff's Medical History and Treatment

Plaintiff was admitted to the ADC in or around 2003.[5]  Defendant Corizon became the contracted medical provider for the ADC on March 4, 2013.  (Doc. 39 ¶ 2.)  Prior to that, non-party Wexford Health Services was the contracted healthcare provider for the ADC.  (*Id.*)

Plaintiff asserts that he was diagnosed with HCV in 2009, and stage II cirrhosis in September 2011.  (Doc. 1 at 3; *see* Doc. 53-1 at 69 (Pl.'s Ex. D).)  HCV is listed as a diagnosed health problem or condition in Plaintiff's ADC medical records, but cirrhosis is not listed as one of Plaintiff's health problems or conditions.  (*See* Doc. 39-1 at 45–47 (Defs.' Ex. FF).)  While incarcerated in the ADC, Plaintiff has filed several Health Needs Requests (HNRs) requesting HCV treatment.  (*See* Doc. 53-1 at 95–98 (Pl.'s Ex. H).)

According to Plaintiff's May 12, 2009 lab test results, his AST and his Alanine Aminotransferase (ALT)[6] were both higher than the listed reference ranges.  (Doc. 53-1 at

---

[5]    *See*    https://corrections.az.gov/public-resources/inmate-datasearch    (search "Number Search" for "102400" and select hyperlink for "Inmate Full Info" for "102400") (last visited Sept. 18, 2019).

[6] ALT is an enzyme that is released into the blood when liver cells are injured; high

70.  (Pl.'s Ex. D).)  Plaintiff's albumin and bilirubin were within normal limits.  (*Id.*)
Plaintiff's labs from October 20, 2009 and July 9, 2010 also showed elevated AST and
ALT with normal albumin and bilirubin.  (*Id.* at 72, 74.)

On November 19, 2010, a FibroSure test was performed to assess Plaintiff for liver
fibrosis, but the results were inconclusive.  (*See id.* at 75 (Pl.'s Ex. E).)  However, the
results indicated that Plaintiff's ALT was over 12 times higher than the upper limit of the
reference range.  (*Id.*)

Plaintiff's lab results from January 7, 2011 and April 8, 2011 indicated that his AST
and ALT were higher than the respective reference ranges, but his bilirubin and albumin
were normal.  (*Id.* at 77–78.)  The results from Plaintiff's July 11, 2011 labs showed that
his AST, albumin, and bilirubin were normal, but his ALT was nearly 6 times higher than
the upper limit of the reference range.  (*Id.* at 79.)

Plaintiff had a liver biopsy taken on August 12, 2011.  (*Id.* at 88 (Pl.'s Ex. F).)
Plaintiff was assessed with "chronic hepatitis with moderate periportal and lobular
inflammation, (Grade 3 of 4) with periportal fibrosis (stage 2 of 4)."  (*Id.*)  But, "[n]o
cirrhosis or neoplasm [was] identified."  (*Id.*)

On May 18, 2012, and June 22, 2012, Plaintiff's AST and ALT were elevated, but
his albumin and bilirubin were normal; similar results were revealed in Plaintiff's August
10, 2012 lab results.  (*Id.* at 80–81 (Pl.'s Ex. E); *see id.* at 93 (Pl.'s Ex. G).)  The results of
Plaintiff's March 22, 2013 labs indicated that his AST, ALT, albumin, and bilirubin were
all within normal limits.  (*Id.* at 83.)

According to an "Initial Hepatitis Work Sheet" that was completed on August 16,
2012, Plaintiff had "previously [been] approved for treatment thru [sic] [ADC]."  (*Id.* at 93
(Pl.'s Ex. G).)  There is no evidence of the particular treatment Plaintiff was approved for,
when he was approved for it, or whether he received it.

---

levels of ALT are a sign of liver damage.  *See* "ALT," *University of Rochester Medical
Center Health Encyclopedia*, https://www.urmc.rochester.edu/encyclopedia/content.aspx?
contenttypeid=167&contentid=alt_sgpt (last visited Sept. 17, 2019).

Plaintiff was taken to the emergency room on January 20, 2013 after he was assaulted by another prisoner. (*Id.* at 100 (Pl.'s Ex. I).) Plaintiff reported severe abdominal pain. (*Id.*) Plaintiff's primary diagnosis was grade III spleen laceration, and his secondary diagnoses were HCV and cirrhosis. (*Id.* at 102.) It is not clear whether the cirrhosis diagnosis was based on Plaintiff's self-report or an objective assessment by the hospital physician. Plaintiff underwent a splenectomy on January 22, 2013. (*Id.* at 107–08.)

On May 3, 2013, Plaintiff had labs taken; the results revealed that Plaintiff's AST level was 51, and his ALT level was 73. (Doc. 39 at 14 (Defs.' Ex. A).) Both results were higher than the listed reference ranges. (*See id.*) Plaintiff's bilirubin and albumin were within the listed reference ranges. (*Id.* at 15.)

On July 10, 2013, Plaintiff submitted a Health Needs Request (HNR) asking for HCV treatment, and he was informed that there "is currently no treatment available through Corizon. We will notify you when treatment is available." (*Id.* at 18 (Defs.' Ex. B).)[7]

On October 4, 2013, Plaintiff had a chronic care visit, and Plaintiff denied having nausea, vomiting, abdominal pain/swelling, diarrhea, or rashes/lesions. (*Id.* at 31 (Defs.' Ex. D).) Plaintiff's HCV "degree of control" was noted as fair, and Plaintiff was directed to return for a chronic care visit in 90 days. (*Id.*)

Plaintiff had a chronic care appointment on January 9, 2014, and Plaintiff denied having any symptoms related to HCV. (*Id.* at 33 (Defs.' Ex. E).) Plaintiff's ALT was 73, and his AST was 51, which were both higher than the respective reference ranges. (*Id.*) Plaintiff's HCV "degree of control" was assessed as good. Plaintiff was scheduled to have more labs taken, and he was directed to return for a chronic care visit in 180 days. (*Id.*)

The following day, Plaintiff had labs taken. (*Id.* at 35–38 (Defs.' Ex. F).) Plaintiff's AST was 76, and his ALT was 158; both results were higher than the listed reference ranges. (*Id.* at 36.) Plaintiff's bilirubin and albumin were within normal limits. (*Id.* at 37.)

---

[7] Defendants assert that Plaintiff had a chronic care visit on July 26, 2013, but the record they cite to is from Plaintiff's May 4, 2018 chronic care visit. (*See* Doc. 39 ¶ 5; Doc. 39 at 20–29 (Defs.' Ex. C).)

On May 9, 2014, Plaintiff had labs taken again.  (*Id.* at 40–44 (Defs.' Ex. G).)  His AST was 54, and his ALT was 75; both results were higher than the reference ranges.  (*Id.* at 41.)  Plaintiff's bilirubin and albumin were within normal limits.  (*Id.* at 42–43.)  When these results were reviewed by Corizon healthcare provider Bonnie Goodman nearly two years later, she noted that Plaintiff's liver enzymes were "abnormal."  (*Id.* at 44.)

On May 25, 2014, Plaintiff submitted another HNR asking for HCV treatment.  (*Id.* at 46 (Defs.' Ex. H).)  Plaintiff was informed that he was being treated for HCV, that he was "just seen in Jan[uary]" and that he would be seen again in July.  (*Id.*)[8]

On November 25, 2014, Plaintiff reported to sick call with complaints of abdominal pain.  (Doc. 53-2 at 2 (Pl.'s Ex. J).)  Plaintiff was prescribed Ibuprofen and "[i]nstructed to let CO [Corrections Officer] know if pain gets worse or if he develop[]s a fever or bloody stool or emesis."  (*Id.* at 6.)  He was also advised to follow-up at the nursing line in the morning.  (*Id.*)

On November 26, 2014, Plaintiff reported to the nursing line to follow-up on his complaints of abdominal pain.  (*Id.* at 8.)  Plaintiff described it as a "twisting pain" in his upper abdomen.  (*Id.*)  Plaintiff's exhibit only includes the first and last pages of the November 26, 2014 Health Services Encounter, and these pages do not include the objective notes, assessment, or plan of treatment from that appointment.  (*See id.* at 8–9.)

On November 27, 2014, Plaintiff reported to sick call with complaints of abdominal pain.  (*Id.* at 10.)  The objective notes state that:

> I/M [Inmate] was seen yesterday for this same issue abd[ominal] pain and bloating, also seen on Thursday night on ICS for this same issue.  Was given MOM [milk of magnesia] and I/m states it did not help.  [Patient's] last BM [bowel movement] was 2 days ago.  [P]ain is 6/10 standing and laying on his back makes it worse, Inmate states his symptoms are not improving.  I/m states that his pain is better than it was since Tuesday.  [A]bdomen is very hard, and distended, and he does

---

[8] There is no record that Plaintiff was seen in July 2014.

> not feel like he needs to have a BM.  Inmate states that his pain
> is a twisting pain.

(*Id.* at 11.)  Nurse Practitioner (NP) Brenda Sheetz was contacted, and "she ordered 2 Bisacodyl [laxative] 5mg [orally] now and push fluids."  (*Id.* at 12.)  She also ordered for Plaintiff to be scheduled with a provider for a follow-up.  (*Id.*)

On November 28, 2014, Plaintiff reported to sick call still complaining of abdominal pain and trouble having a bowel movement.  (*Id.* at 16.)  It was noted that Plaintiff had reported that "he ate 80 dollars of food and snacks from machine during vis[]it, t[]hen felt terrible for the next two days with inability to def[e]cate."  (*Id.*)  Plaintiff's exhibit only includes the first and last pages of the November 28, 2014 Health Services Encounter, and these pages do not include the objective notes, assessment, or plan of treatment from that appointment.  (*See id.* at 16–17.)

On November 30, 2014, Plaintiff returned to sick call and reported that he had been unable to have a bowel movement for 10 days and was still having abdominal pain.  (*Id.* at 18.)  Plaintiff also reported "that he talked to one of the other nurses and he was told it could be an issue with his gal[l]bladder; Plaintiff stated that "he has a family [history] of gal[l]bladder issues and [he] agree[d] that this may be the problem."  (*Id.*)  Upon examination, it was noted that Plaintiff was bloated, and his abdomen was distended.  (*Id.* at 19.)  Plaintiff was instructed to follow-up on the nursing line the next day for orders from the provider.  (*Id.* at 20.)  No further medical records from this timeframe regarding Plaintiff's abdominal pain were provided by either party.

On September 24. 2015, Plaintiff had a chronic care appointment with Goodman.  (Doc. 39 at 48 (Defs.' Ex. I).)  Goodman assessed Plaintiff with HCV with stage 2 liver fibrosis and ordered additional lab tests including "Hepatitis C RNA, Genotyping."  (*Id.* at 52–53.)  The chronic care plan of treatment was to monitor Plaintiff's liver enzymes.  (*Id.* at 54.)  Plaintiff was scheduled for another chronic care appointment in six months.  (*Id.*)  Goodman also made a note to "review paper medical records to see if liver biopsy results present."  (*Id.*)

On October 1, 2015, Plaintiff saw Registered Nurse (RN) Victoria Gonzales during sick call and requested labs for genotyping and an HIV test.  (*Id.* at 57 (Defs.' Ex. J).)  Plaintiff reported that he had not been involved in risky behavior but that he had received tattoos while in prison.  (*Id.*)  An HIV lab test was ordered.  (*Id.* at 59.)

On October 2, 2015, Plaintiff had labs taken.  (*Id.* at 58.)  His AST was 113, and his ALT was 133; both results were above the respective reference ranges.  (*Id.* at 66 (Defs.' Ex. K).)  Plaintiff's bilirubin, albumin, and platelet count were within normal limits.  (*Id.* at 64, 66, 68.)  Plaintiff's APRI score was 1.358 based on an Upper Limit Normal of 40.  (*Id.* at 66.)  The results of Plaintiff's HCV genotyping lab indicated that he has HCV genotype 3, and the results were noted as "normal."  (*Id.* at 71–72 (Defs.' Ex. L).)

On December 20, 2015, Plaintiff submitted another HNR requesting chronic care for his HCV, and he reported that he was "in extreme pain" and his stomach had been swelling.  (*Id.* at 74 (Defs.' Ex. M).)  On December 25, 2015, nurse Carah Hodge saw Plaintiff in response to his HNR.  (*Id.* at 76–83 (Defs.' Ex. N).)  Plaintiff reported that he had been having stomach pain for approximately three weeks and that "his stomach swelled up twice in the past 3 weeks."  (*Id.* at 76.)  Plaintiff stated that the pain was in his right upper abdomen and described it as "constant and stabbing" and that it felt "like bad gas."  (*Id.*)  Plaintiff stated that he had undergone surgery for a ruptured spleen and liver in February 2014.  (*Id.* at 77.)  He also reported constant back pain and nausea.  (*Id.*)  Upon examination, Hodge made the following observations: "Patient is guarding of stomach, hunched [sic] over in pain, abdomen is flat with large bounding abdominal pulse.  [B]owel sounds are hyperactive, pain with palpation over the right upper quadrant.  Liver borders felt and heard with percussion tapping over the borders."  (*Id.*)  Hodge also noted that Plaintiff's abdomen was rigid and had visible bulges.  (*Id.* at 78.)  Plaintiff's urinalysis results were listed as "abnormal."  (*Id.* at 81.)  The provider was contacted, and Plaintiff was referred to the provider.  (*Id.*)

On January 6, 2016, Plaintiff reported to sick call complaining of abdominal pain.  (Doc. 53-2 at 41 (Pl.'s Ex. L).)  The objective notes state that Plaintiff "was seen on the

nurse line on 12/25 and was given an[] IV of normal saline.  Was diagnosed with a UTI [urinary tract infection].  Cipro [antibiotic] was also ordered.  P[atien]t has taken all of the ordered antibiotics and still has abdominal pain." (*Id.* at 42.)  The assessment notes indicate that Plaintiff "ha[d] not seen the provider yet for this issue" even though he was referred to the provider on December 25, 2015.  (*Id.* at 44.)  Another urinalysis was done, and Plaintiff's pH, occult blood, and leukocyte levels were "abnormal." (*Id.*)  A note was made to schedule Plaintiff with the provider.  (*Id.* at 45.)

On January 13, 2016, Plaintiff was seen at sick call for abdominal pain.  (*Id.* at 47.)  It was noted that Plaintiff had recently been diagnosed with a UTI due to his high pH level.  (*Id.*)  Plaintiff was assessed with abdominal pain, gallbladder adhesions, and hematuria.  (*Id.* at 51.)  Another urinalysis was ordered because Plaintiff's last urinalysis was "very unusual." (*Id.*)  Plaintiff was given three hemoccult stool test kits, and a note was made to consider a gallbladder ultrasound or a renal ultrasound.  (*Id.* at 52.)  No further medical records from this timeframe regarding Plaintiff's abdominal pain were provided by either party.

Plaintiff had a chronic care appointment with Corizon provider Christina Boryczka via "interactive telemedicine" on June 8, 2016.  (Doc. 39 at 85 (Defs.' Ex. O).)  Plaintiff reported intermittent abdominal pain.  (*Id.*)  Boryczka suspected that Plaintiff's abdominal might be due to gastroesophageal reflux disease (GERD), and prescribed Omeprazole (Prilosec) to treat it.  (*Id.* 89–90.)  Boryczka noted that Plaintiff should be tested for Hepatitis A/B, and if he was not immune, he should be vaccinated.  (*Id.* at 89.)  She also noted that Plaintiff was "[n]ot a candidate for [HCV] treatment based on [his] most recent APRI score of 1.36.  (*Id.*)  Boryczka ordered additional lab tests, including a Hepatitis A/B panel, and a Helicobacter Pylori ("H Pylori") lab to assess Plaintiff for GERD.  (*Id.* at 90.)

The following day, Plaintiff had labs taken.  (*Id.* at 94–98 (Defs.' Ex. P).)  His AST was 25, and his ALT was 30; both results were within normal limits.  (*Id.* at 96.)  Plaintiff's bilirubin, albumin, and platelet count were within normal limits as well.  (*Id.* at 94, 96, 98.)

Plaintiff's APRI score was 0.210 based on an Upper Limit Normal of 40.  (*See id.* at 97–98.)

On June 29, 2016, Plaintiff was seen at sick call after complaining "that he had been told he had a kidney infection, and hasn't been given medication for it."  (Doc. 53-2 at 63 (Pl.'s Ex. M).)[9]  The objective notes stated that:

> After reading through HS [Health Services] Encounters and lab results, it was determined that his H Pylori was positive and [he] had been ordered to receive a triple regimen.  This had not been started and has since expired.  Have new order for treatment.  P[atien]t still is concerned that he has an UTI. Unable to produce a urine sample for a dipstick.

(*Id.* at 64.)  Plaintiff was to be started on triple therapy for his positive H Pylori, and he was instructed to bring a urine sample to the medical unit in the morning for a urine dipstick.  (*Id.* at 68, 70.)

The following day, Plaintiff reported to sick call with a urine sample that the nurse described as "malodorous."  (*Id.* at 71.)  Plaintiff complained of frequency of urination and burning during urination.  (*Id.*)  Plaintiff's urinalysis was positive for nitrates and leukocytes esterase.  (*Id.*)  He was diagnosed with a UTI, prescribed antibiotics, and a urine culture was ordered.  (*Id.* at 71, 73–80.)

On July 12, 2016, Plaintiff returned to sick call because he was "concerned about less frequent urination" and was having abdominal pain.  (*Id.* at 92.)  Plaintiff was asked to do a urinalysis dipstick, but "he said he didn't need to go" and that he would do it the next morning.  (*Id.* at 97.)

Plaintiff had a chronic care appointment with Corizon provider Winfred Williams on September 17, 2016.  (Doc. 39 at 101–08 (Defs.' Ex. Q).)  Plaintiff denied nausea, vomiting, fever, and constipation ("N/V/F/C"), but he believed that his UTI had returned.  (*Id.* at 101.)  Williams noted left flank tenderness with palpation and advised Plaintiff to quit all tobacco products, take his medication as prescribed, and to follow-up with chronic

---

[9] There is no evidence in the record that Plaintiff had been diagnosed with a kidney infection.

care in six months.  (*Id.* at 103, 107–08.)  A urinalysis dipstick was negative for infection and blood.  (*Id.* at 103.)

On February 27, 2017, Plaintiff reported to sick call with complaints of stomach pain, nausea, constipation, and vomiting.  (Doc. 53-1 at 101 (Pl.'s Ex. O).)  It was noted that Plaintiff was "guarding" his abdomen and was leaning forward in his chair.  (*Id.* at 102.)  Upon examination, the nurse observed that Plaintiff had "hypo active bowel sounds in all quads" and that his abdomen was tender, distended, and firm.  (*Id.*)  Plaintiff was given Diphenhydramine (anti-histamine) and Lidocaine (pain), and after 10 minutes, he reported that his pain had subsided.  (*Id.* at 106.)

On March 17, 2017, Plaintiff had a chronic care visit with Corizon provider Leo Easley.  (Doc. 39 at 110–17 (Defs.' Ex . R).)  Easley noted that Plaintiff's abdomen was flat, soft, and non-tender with positive bowel sounds, and Plaintiff's APRI score was 0.248.  (*Id.* at 112, 116.)  Easley advised Plaintiff to stay hydrated, avoid salty/fatty foods and caffeine, exercise as tolerated, and avoid risky behaviors.  (*Id.* at 116.)  Easley also ordered lab tests.  (*Id.* at 117.)

Plaintiff had labs taken on June 2, 2017.  (*Id.* at 119 (Defs.' Ex. S).)  His ALT was within normal limits at 29, and his AST was 37, which was slightly above the listed upper limit of 34.  (*Id.* at 120.)  Plaintiff's bilirubin, albumin, and platelet count were within normal limits.  (*Id.*)  Plaintiff's APRI score was 0.417 based on an Upper Normal Limit of 34.  (*See id.* at 120–21.)

On September 7, 2017, Plaintiff had a chronic care appointment with Dr. James Baird via interactive telemedicine.  (*Id.* at 126 (Defs.' Ex. T).)  Dr. Baird noted Plaintiff's 0.417 APRI score and assessed that Plaintiff's HCV was "stable."  (*Id.* at 128, 131.)  Dr. Baird advised Plaintiff to abstain from alcohol, drugs, and prison tattoos, and he ordered more lab tests and scheduled Plaintiff to return to chronic care in six months.  (*Id.* at 132.)

During an October 27, 2017 appointment regarding Plaintiff's chronic back pain, NP Elena Baskas noted that Plaintiff had recently tested positive for methamphetamines.  (*Id.* at 135 (Defs.' Ex. U).)  Plaintiff disputes this fact, and he asserts that he has "never

1  tested positive for any illicit drug, including methamphetamines." (Doc. 50 at 2 (Pl. Decl.
2  ¶ 6).)

3         On December 21, 2017, Plaintiff authored Inmate Letters addressed to Defendants
4  Ryan and Pratt stating that he had been diagnosed with stage II cirrhosis in 2011 and
5  requesting HCV treatment.  (Doc. 53-1 at 61–62 (Pl.'s Ex. B).)  Plaintiff asserts that
6  Defendants Ryan and Pratt failed to respond to his letters (Doc. 52-1 at 7 (Pl.'s Statement
7  of Facts ¶ 71)), but there is no evidence in the record that they received, or were aware of,
8  Plaintiff's letters.[10]

9         On or about December 22, 2017, Plaintiff submitted an HNR requesting treatment
10 for HCV.  (Doc. 39 at 141 (Defs.' Ex. V).)  Plaintiff was seen by RN Wilbert Williams that
11 same day regarding his HNR.  (*Id.*)  Plaintiff reported that he "ha[d] no presenting s/sx
12 [signs or symptoms] but wants to be treated." (*Id.*)  Williams noted that Plaintiff's recent
13 results indicated that Plaintiff's HCV was stable and that he had another chronic care visit
14 scheduled.  (*Id.* at 141, 146.)  Williams advised Plaintiff to stay hydrated, avoid salty and
15 fatty foods, exercise as tolerated, and to avoid smoking and other risky behaviors.  (*Id.* at
16 148.)

17        On December 29, 2017, Plaintiff reported to sick call with complaints of
18 constipation and abdominal pain.  (Doc. 53-2 at 110 (Pl.'s Ex. O).)  Plaintiff was advised
19 to purchase milk of magnesia from the commissary and was instructed on the proper
20 dosing.  (*Id.* at 117.)  Plaintiff was also advised to drink plenty of fluids and to notify
21 medical of any new or worsening symptoms.  (*Id.*)

22        On January 3, 2018, Plaintiff submitted an Informal Complaint stating that he had
23 been diagnosed with HCV and stage II cirrhosis and requesting a liver biopsy and HCV
24 treatment.  (Doc. 53-1 at 67 (Pl.'s Ex. C).)

---

[10] According to the ADC grievance policy, to start the grievance process, a prisoner must first attempt to resolve their complaint informally through "discussion with staff in the area most responsible for the complaint or through the submission of an Inmate Informal Complaint Resolution, Form 802-11." (Doc. 53-1 at 8 (ADC Department Order 802.02 § 1.1).)

1    Plaintiff had labs taken on January 12, 2018.  (Doc. 39 at 151 (Defs.' Ex. W).)

2    Plaintiff's AST was 501, his ALT was 975, and his APRI score was 5.540, which was

3    calculated using an Upper Normal Limit of 34.  (*See id.* at 152.)  Plaintiff's albumin,

4    bilirubin, and platelet count were within normal limits.  (*Id.*)

5    The following day, Plaintiff saw NP David Workman who had received a lab alert

6    due to Plaintiff's high APRI score from the previous day.  (*Id.* at 158 (Defs.' Ex. X).)

7    Workman reviewed Plaintiff's medication and usage and could not find any reason for

8    Plaintiff's elevated liver enzymes and APRI score.  (*Id.*)  Workman noted that Plaintiff's

9    Hep C RNA PCR had been drawn, and the results were pending.  (*Id.*)  Plaintiff asserts that

10   he informed Workman that he had undergone a splenectomy in 2013 due to blunt force

11   trauma to his abdomen.  (Doc. 50 at 6 (Pl. Decl. ¶ 22).)

12   On January 17, 2018, Plaintiff saw NP Julie Shute for follow-up on his recent

13   elevated APRI score.  (Doc. 39 at 164 (Defs.' Ex. Y).)  Shute noted that Plaintiff did not

14   report any signs or symptoms of HCV including jaundice, abdominal swelling, increased

15   abdominal pressure, increased girth, dark urine, light colored stools, or peripheral edema.

16   (*Id.*)  She also noted that Plaintiff told her he was still getting prison tattoos, but he denied

17   the use of drugs and alcohol.  (*Id.*)  Plaintiff reported some fatigue with exercise and

18   requested a liver biopsy.  (*Id.*)  Plaintiff asserts that he also informed Shute that he was

19   experiencing HCV-related bloating and contends that he never stated that he was still

20   getting prison tattoos.  (Doc. 50 at 2 (Pl. Decl. ¶ 8).)  Plaintiff states that he did not get a

21   prison tattoo after 2015.  (*Id.* at 9 (Pl. Decl. ¶¶ 33–34).)  Shute ordered additional lab testing

22   including metabolic testing, comprehensive Hepatitis testing, liver enzyme testing,

23   pancreatic enzyme testing, and an HIV test.  (Doc. 39 at 168 (Defs.' Ex. Y).)  Plaintiff was

24   scheduled for a follow-up in one week.  (*Id.* at 169.)

25   Throughout January 2018, Plaintiff's wife sent several e-mails to ADC and Corizon

26   officials requesting HCV treatment for Plaintiff.  (Doc. 53-3 at 74–91 (Pl.'s Ex. T).)  On

27   January 16, 2018, a representative from Middle Ground Prison Reform (MGPR) addressed

28

an e-mail to several officials, including Defendants Ryan and Pratt, on Plaintiff's behalf requesting HCV treatment in light of Plaintiff's elevated liver enzymes. (*Id.* at 77.)

On January 19, 2018, Program Evaluation Administrator Vanessa Headstream responded to the e-mail and stated: "The allegations brought forth in your below email were forwarded to Corizon leadership for investigation and any action deemed necessary. Corizon has advised that they have been in contact with [Plaintiff's wife] regarding her husband." (*Id.* at 81.) Defendants Ryan and Pratt were copied in Headstream's e-mail. (*Id.*)

That same day, Plaintiff had a Fibrotest and additional labs taken, and the results indicated that his ALT and AST were high and that he had "advanced fibrosis." (Doc. 53-3 at 34–35, 39 (Pl.'s Ex. S, Attachs. B, C).) Plaintiff's Metavir score indicated severe inflammation. (*Id.*)

On January 23, 2018, Assistant Director of Nursing Stephanie Aquino responded to Plaintiff's January 3, 2018 Informal Complaint as follows:

> Your inmate informal complaint dated 1/3/18 was received in the Tucson office of Corizon Inmate Health Services on 1/4/18. Your primary area of concern is not being treated for HEP C. Your concern has been reviewed by medical and it was determined that on 1/17/18 you saw the medical provider who went over your current health status extensively. At this time you do not meet the necessary criteria to qualify for HEP C treatment while in ADOC. If you have further questions about the HEP C criteria please discuss this at your next chronic care appointment.

(Doc. 39-1 at 120 (Defs.' Ex. JJ).)

On January 25, 2018, Plaintiff had a follow-up appointment with NP Shute. (Doc. 39 at 172 (Defs.' Ex. Z).) Shute noted that Plaintiff's labs indicated immunity to Hepatitis A, but chronic infection with Hepatitis B. (*Id.*) Plaintiff denied signs or symptoms of HCV. (*Id.*) Plaintiff was advised to stay hydrated, stop smoking, avoid risky behaviors, and engage in moderate exercise. (*Id.* at 176.)

On January 30, 2018, Corizon Regional Grievance Coordinator Manuel Vega sent a letter to Defendant Pratt informing him that Plaintiff's wife had been requesting HCV treatment on Plaintiff's behalf and summarizing the findings from Plaintiff's recent labs and follow-up with NP Shute.  (Doc. 53-3 at 93 (Pl.'s Ex. U).)  Vega's letter informed Defendant Pratt that a lab alert was issued after Plaintiff's ALT and AST were found to be highly elevated on January 12, 2018; that additional lab tests had been ordered; that Plaintiff tested positive for Hepatitis B; and that Plaintiff was advised to return for a follow-up in five weeks.  (*Id.*)  He also noted that the authorization for releasing Plaintiff's medical records to his wife was being processed.  (*Id.*)  Vega also sent a copy of this letter in an e-mail addressed to Plaintiff's wife and Defendant Pratt on January 31, 2018:

> We are in receipt of the concern regarding [Plaintiff] that was sent by [Plaintiff's wife].  I have read the entirety of the complaint and have completed a thorough chart review of this inmate's medical chart.  Attached is a copy of my chart summary along with the response to the concern that is referred to in [Plaintiff's wife's previous e-mail].

(*Id.* at 90.)  Defendant Ryan was copied on this e-mail.  (*Id.*)

On February 2, 2018, Plaintiff submitted an Inmate Grievance requesting HCV treatment or to be taken to an outside consultant to receive treatment.  (Doc. 53-1 at 65 (Pl.'s Ex. C).)

On February 6, 2018, Plaintiff's wife responded to Vega's January 31 e-mail and stated that Vega's chart summary had failed to address "a plan of action or treatment due to" Plaintiff's elevated lab results.  (Doc. 53-3 at 97–98 (Pl.'s Ex. U).)

On February 7, 2018, Plaintiff saw Dr. Abel Salazar for a chronic care appointment, and Dr. Salazar noted that Plaintiff's most recent labs showed that his liver enzymes were back to within normal limits; his AST was 31, and his ALT was 38.  (Doc. 39-1 at 2 (Defs.' Ex. AA).)  Plaintiff reported that he "feels well."  (*Id.*)  Dr. Salazar noted that Plaintiff's HCV was stable and directed Plaintiff to return to chronic care in 90 days.  (*Id.* at 6.)

On February 8, 2018, Vega sent a letter to Defendant Pratt informing him that Plaintiff's recent labs showed that his liver enzymes had returned to within normal limits

and Plaintiff's condition would continue to be monitored through chronic care appointments and lab testing.  (Doc. 53-3 at 99 (Pl.'s Ex. U).)  That same day, Vega e-mailed a copy of this letter to Plaintiff's wife and several ADC officials including Defendants Ryan and Pratt.  (*Id.* at 95.)

On February 14, 2018, Defendant Schmid responded to Plaintiff's February 2 Inmate Grievance as follows:

> Your inmate grievance dated 2/2/18 was received in the Tucson office of Corizon Inmate Health Services on 2/2/18. Your primary area of concern is a treatment for Hepatitis C. Your concern has been reviewed by medical and it was determined on 1/17/18 you saw the provider.  She explained to you the criteria for Hepatitis C treatment.  At this time you do not meet the qualifications for treatment.  Please keep your chronic care appointments to monitor your disease.

(Doc. 39-1 at 122 (Defs.' Ex. KK).)

Plaintiff's February 16, 2018 lab results indicated that his ALT and bilirubin were within normal limits, and his AST and albumin were slightly elevated.  (Doc. 53-3 at 45 (Pl.'s Ex. S, Attach. D).)

Plaintiff had labs taken on February 23, 2018.  (Doc. 39-1 at 9 (Defs.' Ex. BB).) Plaintiff's AST was 30 and his ALT was 27, which were both within normal limits.  (*Id.* at 10.)  Plaintiff's bilirubin, albumin, and platelet count were also within normal limits.  (*Id.*) Plaintiff's APRI score was 0.316 based on an Upper Normal Limit of 34.  (*See id.*)

Plaintiff had a chronic care appointment with NP Awaal via interactive telemedicine on May 4, 2018.  (*Id.* at 16 (Defs.' Ex. CC).)  Awaal noted that Plaintiff's most recent liver function tests were stable and that Plaintiff's HCV would continue to be monitored.  (*Id.* at 22, 24.)  Plaintiff was instructed on adopting a healthy lifestyle, managing his weight, and abstaining from alcohol, smoking, and intravenous drug use.  (*Id.* at 24.)

On August 24, 2018, Plaintiff had labs taken; his AST and ALT were within normal limits, and his APRI score was 0.226 based on an Upper Normal Limit of 34.  (*Id.* at 28

1  (Defs.' Ex. DD).)  Plaintiff's bilirubin, albumin, and platelet count were also within normal

2  limits.  (*Id.*)

3          On November 15, 2018, Plaintiff had a chronic care appointment with NP Awaal

4  via interactive telemedicine.  (*Id.* at 34 (Defs.' Ex. EE).)  Awaal noted that Plaintiff's HCV

5  was stable, advised Plaintiff to maintain a healthy lifestyle free of risky behaviors, and

6  directed him to return for follow-up in 90 days.  (*Id.* at 42.)

7          On January 25, 2019, Plaintiff had labs taken and a Fibrotest was also performed to

8  assess Plaintiff for fibrosis.  (Doc. 56-1 at 2 (Defs.' Ex. MM).)  Plaintiff's bilirubin and

9  ALT were within normal limits.  (*Id.* at 2–3.)  The results of the Fibrotest indicated that he

10  had minimal to moderate fibrosis (stage 1 or 2).  (*Id.* at 4.)  Plaintiff's Metavir score showed

11  no liver inflammation.  (*Id.* at 3–4.)

12          On March 15, 2019, Plaintiff had labs taken, and the results revealed that Plaintiff's

13  HCV was non-detectable.  (Doc. 56-3 at 3 (Defs.' Ex. NN2).)  On April 2, 2019, Plaintiff

14  had a follow-up appointment with NP Natalya Weigel to go over his lab results, and she

15  informed Plaintiff that his HCV was non-detectable in his most recent lab results.  (*Id.* at 2

16  (Defs.' Ex. NN1).)  An HCV panel was ordered to be completed prior to Plaintiff's next

17  chronic care appointment.  (*Id.* at 6.)

18          Plaintiff had labs taken on April 5, 2019, and the results showed that his albumin,

19  bilirubin, AST, ALT, and platelet count were within normal limits.  (*Id.* at 3 (Defs.' Ex.

20  OO).)  Plaintiff's APRI score was 0.269 based on an Upper Limit Normal of 34.  (*Id.*)

21  **IV.    Statute of Limitations**

22          The Court will first address Defendants' argument that Plaintiff's claim is barred by

23  the statute of limitations.  (*See* Doc. 42 at 11.)

24          Section 1983 does not include its own statute of limitations.  *TwoRivers v. Lewis*,

25  174 F.3d 987, 991 (9th Cir. 1999).  Therefore, federal courts apply the statute of limitations

26  governing personal injury claims in the forum state, "along with the forum state's law

27  regarding tolling, including equitable tolling, except to the extent any of these laws is

28  inconsistent with federal law."  *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191,

1198 (9th Cir. 2014) (citation omitted).  In Arizona, the limitations period for personal injury claims is two years.  *Marks v. Parra*, 785 F.2d 1419, 1420 (9th Cir. 1986); *see also* Ariz. Rev. Stat. § 12-542 (providing that actions for personal injury must be commenced within two years after the cause of action accrues).  Also, under Arizona law, the limitation period is tolled during mandatory exhaustion of administrative remedies.  *See Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005).

Although the statute of limitations applicable to § 1983 claims is borrowed from state law, federal law continues to govern when a § 1983 claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).  Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).

Here, Defendants assert that "Plaintiff's date of injury should be July 26, 2013, when Plaintiff was assessed for chronic care and not provided his desired treatment" and that Plaintiff brought this action nearly five years after that on March 3, 2018.  (Doc. 42 at 11.)  In response, Plaintiff contends that the statute of limitations was tolled while he completed the administrative grievance process in 2018.  (Doc. 52 at 8.)  Defendants reply that "[t]he timing of Plaintiff's grievances is irrelevant to when Plaintiff was placed on notice for purposes of the statute of limitations.  The crucial time is when the Plaintiff knew or should have known that a cause of action exi[s]ted."  (Doc. 55 at 3.)

The evidence shows that Plaintiff initiated the administrative grievance process on January 3, 2018 when he submitted his Informal Complaint.  (Doc. 53-1 at 67 (Pl.'s Ex. C).)  The record also shows that Plaintiff fully exhausted his medical claim on February 14, 2018, when Defendant Schmid responded to his Inmate Grievance; Defendant Schmid's response states that it "is final and constitutes exhaustion of all remedies within the Department."  (Doc. 53-1 at 64 (Pl.'s Ex. C).)  However, the Court need not determine whether the limitations period was tolled while Plaintiff's pursued his grievance because his medical claim is rendered timely in this action under the continuing violation doctrine.

1   "The [continuing violation] doctrine applies where there is 'no single incident' that

2   can 'fairly or realistically be identified as the cause of significant harm.'"   *Flowers v.*

3   *Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) (internal citation omitted); *see Nesovic v.*

4   *United States*, 71 F.3d 776, 778 (9th Cir. 1995) (continuing violation doctrine applies to

5   "repeated instances or continuing acts of the same nature, as for instance, repeated acts of

6   sexual harassment or repeated discriminatory employment practices.").   Under this

7   doctrine, the limitation period does not begin to run until the wrongful conduct ends.

8   *Flowers*, 310 F.3d at 1126.   This doctrine is particularly applicable in the Eighth

9   Amendment deliberate indifference context in which isolated instances of deficient

10   medical care or lack of proper treatment do not generally suffice to state a claim, but

11   repeated failures to treat the patient properly strongly suggest deliberate indifference.   *See*

12   *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) *overruled on other grounds by*

13   *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

14   Numerous courts have applied the continuing violation doctrine to prisoners'

15   medical care claims.   *See Evans v. Cnty. of San Diego,* No 06 CV-0877-JM (RBB), 2008

16   WL 842459, at *12 (S.D. Cal. March 27, 2008) (citing cases that applied continuing

17   violations doctrine to section 1983 claims based on deliberate indifference and holding that

18   the statute of limitations began running on the last date of the allegedly unconstitutional

19   medical treatment).   This Court has also applied the continuing violation doctrine to

20   prisoners' medical care claims and specifically rejected the same statute of limitations

21   argument that Defendants raise here.   *See Spencer v. Sharp*, No. CV 10-0249-PHX-SMM

22   (JRI), 2011 WL 13190170, at *11 (D. Ariz. March 31, 2011) (finding that the plaintiff's

23   claims were not time-barred because the plaintiff's allegations of repeated denials of

24   outside consult requests and medical treatment and that those denials led to worsening

25   vision problems stated a type of continuing violation); *Hughes v. Schriro*, No. CV 08-0657-

26   TUC-RCC, 2010 WL 11475864, at *8–9 (D. Ariz. Aug. 23, 2010) (denying request for

27   dismissal on statute of limitations grounds because the plaintiff alleged repeated and

28

1   continued denials of care for his hepatitis conditions, which stated a type of continuing

2   violation).

3           Generally, for the continuing violation doctrine to apply, "there needs to be an

4   allegation that the specific acts alleged are instances of some broader policy." *Eichler v.*

5   *Tilton,* No. CIV S-06-2894-JAM-CMK-P, 2010 WL 399135, at *5 (E.D. Cal. Jan. 28,

6   2010) (finding that the prisoner-plaintiff's allegations of ongoing violations of his need for

7   dental care from 1995 through 2006 were sufficient to state a continuing violation)

8   (citing *Gutowsky v. Cnty. of Placer*, 108 F.3d 256, 260 (9th Cir. 1997)).  Here, Plaintiff

9   alleges that ADC and Corizon's practice of withholding HCV treatment caused him harm

10  and is still ongoing, meaning he continues to suffer from the same alleged constitutionally

11  deficient patterns and practices that form the basis of his claim.  (*See* Doc. 1 at 10.)

12  Accordingly, under the continuing violation doctrine, the limitations period has not yet

13  begun to run as to Plaintiff's medical claim.  Defendants have failed to show that Plaintiff's

14  claim is time-barred, and summary judgment on this basis will be denied.

15  **V.   Deliberate Indifference**

16      **A.   Legal Standard**

17          Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted

18  with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091,

19  1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two

20  prongs to the deliberate-indifference analysis: an objective prong and a subjective prong.

21  First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations

22  omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could

23  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

24  *McGuckin*, 974 F.2d at 1059-60.  Examples of a serious medical need include "[t]he

25  existence of an injury that a reasonable doctor or patient would find important and worthy

26  of comment or treatment; the presence of a medical condition that significantly affects an

27  individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*,

28  974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**B.    Objective Prong**

1     There is no dispute that HCV constitutes a serious medical need.  Further, the

2  available medical records show that Plaintiff's condition is "worthy of comment or

3  treatment[,]" including chronic care appointments, routine blood testing, a liver biopsy,

4  and diagnostic tests for fibrosis.  *See McGuckin*, 974 F.2d at 1059-60.  Thus, the record

5  supports the finding of a serious medical need.  The Court will therefore consider whether

6  Defendants' responses to Plaintiff's serious medical need amounted to deliberate

7  indifference.

8     **C.     Defendant Schmid**

9     In his Complaint, Plaintiff alleges that Defendant Schmid is responsible for ensuring

10  that ADC prisoners with chronic medical conditions "are entered into the . . . electronic

11  tracking system" so that they "are seen on a regularly scheduled basis."  (Doc. 1 at 4.)

12  Plaintiff asserts that Defendant Schmid failed to ensure that Plaintiff received HCV

13  treatment when he denied Plaintiff's Inmate Grievance on February 14, 2018.  (*Id.* at 9.)

14     Defendant Schmid is a state-licensed Registered Nurse.  (Doc. 39-1 at 124 (Schmid

15  Decl. ¶ 4).)  He has Master's degrees in Science and in Chemistry.  (*Id.*)  As FHA,

16  Defendant Schmid acts in an administrative capacity, and he is responsible for responding

17  to prisoners' administrative grievances and "assur[ing] that the issues in said grievances

18  have been addressed or a plan is in place for the issues to be addressed."  (*Id.*¶¶ 5–6.)

19  Defendant Schmid asserts that he relies on medical providers to assess and provide

20  appropriate medical care to prisoners.  (*Id.* ¶ 6.)  He does not make clinical decisions or

21  provide treatment to prisoners.  (*See id.* ¶¶ 6, 9.)

22     Defendant Schmid's only personal involvement in Plaintiff's medical treatment was

23  responding to Plaintiff's Inmate Grievance on February 14, 2018.  (Doc. 39-1 at 122 (Defs.'

24  Ex. KK).)  In his response, Defendant Schmid informed Plaintiff that he did not meet the

25  criteria to receive HCV treatment and advised Plaintiff to continue attending his chronic

26  care appointments so that his condition could be monitored.  (*Id.*)  Defendants have

27  presented evidence that the final decision on whether a prisoner receives HCV treatment is

28  made by the HCV Committee.  (Doc. 39-1 at 125 (Schmid Decl. ¶ 9).)  Plaintiff has not

refuted this evidence or otherwise shown that Defendant Schmid was authorized to approve him for HCV treatment.  Absent any facts showing that Defendant Schmid could have intervened and approved Plaintiff for HCV treatment, Defendant Schmid's limited role in Plaintiff's medical care did not amount to deliberate indifference, and he will be dismissed in his individual capacity.  *See Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988) ("inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation").

To the extent Plaintiff sues Defendant Schmid in his official capacity, this claim also fails.  For an individual to be liable in his or her official capacity, a plaintiff must allege injuries resulting from a policy, practice, or custom of the agency over which that individual has final policy-making authority.  *See Cortez v. Cnty. of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2002).  Under Arizona law, the ADC Director is responsible for the overall operations and policies of the ADC, including providing medical and health services for prisoners.  Ariz. Rev. Stat. §§ 31-201.01(D) ("The director shall provide medical and health services for the prisoners.") and 41-1604(A)(1) (The ADC Director is "responsible for the overall operations and policies of the department.").  Plaintiff has not presented any evidence that Defendant Schmid's decisions constitute final policy for the ADC.  Accordingly, Defendant Schmid will also be dismissed in his official capacity.

### D.   Defendants Pratt and Ryan

Plaintiff alleges that Defendant Pratt "is responsible for holding [Corizon] accountable to ensure all inmates are provided access to" medical care.  (Doc. 1 at 4.) Plaintiff asserts that Defendant Pratt "has failed to monitor Corizon's HCV examination, assessment and treatment practices, which has . . . caused ADC/Corizon staff and [healthcare providers] not to follow HCV clinical guidelines and expert recommendations."  (*Id.* at 9.)  Plaintiff further asserts that Defendant Ryan "is responsible for the overall operations and policies of ADC" including the provision of prisoner

1    healthcare and medical services and that Defendant Ryan implemented a policy that has

2    failed to provide Plaintiff with meaningful treatment for his HCV.  (*Id.* at 4, 11.)

3           Plaintiff's allegations against Defendants Ryan and Pratt are not supported by the

4    record.  As for Defendants Ryan and Pratt's personal involvement with Plaintiff's medical

5    treatment, the facts show that on December 21, 2017, Plaintiff addressed Inmate Letters to

6    Defendants Pratt and Ryan requesting HCV treatment, but there is no indication that

7    Defendants Pratt and Ryan received, or were aware of, Plaintiff's letter.  (Doc. 53-1 at 61–

8    62 (Pl.'s Ex. B).)  Thereafter, on January 16, 2018, Defendants Pratt and Ryan were

9    included in an e-mail sent by MGPR on Plaintiff's behalf requesting HCV treatment in

10    light of Plaintiff's recent lab reports that showed significantly elevated liver enzymes.

11    (Doc. 53-3 at 77 (Pl.'s Ex. T).)  Defendants Pratt and Ryan did not personally respond to

12    the e-mail, but the record shows that the allegations in MGPR's e-mail were investigated,

13    and the results of the investigation were reported to Defendant Pratt by Regional Grievance

14    Coordinator Vega in a letter dated January 31, 2018.  (*Id.* at 93 (Pl.'s Ex. U).)  A copy of

15    this letter was also sent to Defendant Ryan that same day.  (*Id.* at 90.)  Specifically, Vega's

16    letter stated that Plaintiff had HCV, his recent labs showed severely elevated liver enzymes,

17    and additional testing had been ordered.  (*Id.* at 93.)  Thereafter, in a letter dated February

18    8, 2018, Vega informed Defendant Pratt that after additional testing, Plaintiff's liver

19    enzymes had returned to normal.  (*Id.*at 99.)  A copy of this letter was also sent to Defendant

20    Ryan that same day.  (*Id.* at 95.)  Defendants Ryan and Pratt's limited personal participation

21    in Plaintiff's medical treatment did not amount to deliberate indifference where they

22    deferred to the qualified medical staff to investigate and address Plaintiff's abnormal lab

23    results.  Absent any evidence that Defendants Ryan and Pratt were medically trained or

24    qualified to make clinical decisions, their deference to the medical staff did not amount to

25    a constitutional violation.

26           Further, to the extent Plaintiff argues that Defendants Ryan and Pratt failed to ensure

27    that Corizon met its contractual obligation to provide him with appropriate medical

28    treatment, this argument is also not supported by the record.  The undisputed facts show

that Plaintiff received regular examinations and monitoring of his HCV, including lab tests of his liver enzyme levels and APRI scores.  Plaintiff's APRI score was routinely evaluated between May 2009 and April 2019, and it fluctuated between 0.210 and 1.358, thus remaining in the low to intermediate priority range and well below the 2.0 threshold that would suggest possible cirrhosis and warrant a referral to the HCV Committee.  Plaintiff was assessed with stage 2 liver fibrosis during his August 2011 liver biopsy and by NP Goodman in September 2015, but this would only place him as intermediate priority for treatment under the BOP Guidelines.  ((Doc. 39 at 52–53 (Defs.' Ex. I).)  Likewise, Plaintiff's coinfection with Hepatitis B would only place him as intermediate priority. (Doc. 39-1 at 82.)

On the single, brief occasion that Plaintiff's APRI score went above 2.0, the Corizon staff promptly conducted additional testing to determine a cause for the elevated lab result. (Doc. 39 at 151–52 (Defs.' Ex. W), 168 (Defs.' Ex. Y).)  The additional testing indicated that Plaintiff had advanced fibrosis and severe inflammation, but within approximately two weeks, Plaintiff's liver enzymes had returned to normal.  (Doc. 53-3 at 34–35, 39 (Pl.'s Ex. S, Attachs. B, C); Doc. 39-1 at 2 (Defs.' Ex. AA).)  Since that time, his lab tests have remained normal.  (Doc. 39-1 at 9–10 (Defs.' Ex. BB), 28 (Defs.' Ex. DD); Doc. 56-1 at 2–4 (Defs.' Ex. MM).)  Plaintiff's January 25, 2019 Fibrotest revealed minimal to moderate fibrosis, and his Metavir score showed no liver inflammation.  (Doc. 56-1 at 3–4.) Plaintiff's HCV was non-detectable in March 2019, and his most recent lab tests—as of the close of briefing on the Motion for Summary Judgment—showed normal liver enzymes and an APRI score that fell within the low priority range.  (Doc. 56-3 at 2–4 (Defs.' Ex. NN); Doc. 56-4 at 3 (Defs.' Ex. OO).)

Plaintiff asserts that he was diagnosed with cirrhosis, but other than his own self reports, there is no indication in his medical records that he was ever diagnosed with cirrhosis.  In fact, according to Plaintiff's August 12, 2011 liver biopsy, "[n]o cirrhosis or neoplasm [was] identified."  (Doc. 53-1 at 88 (Pl.'s Ex. F).)  Even if he was assessed with cirrhosis in the past, his most recent medical records do not indicate that he has cirrhosis.

1    To the extent Plaintiff argues that his intermittent complaints of abdominal pain indicated

2    a need for HCV treatment, there is no evidence linking his occurrences of abdominal pain

3    to his HCV, and the medical records show that each time Plaintiff reported abdominal pain,

4    it was addressed by the medical staff.  Further, although Plaintiff's APRI scores *may* have

5    been affected by his splenectomy, absent facts showing that the multi-year trends in

6    Plaintiff's APRI score were inaccurate, any contention that Plaintiff's APRI scores should

7    be disregarded are pure speculation.  Plaintiff also argues that his AST and ALT levels

8    were frequently elevated, and that this evinces that he should have received HCV treatment.

9    But Plaintiff does not provide any medical expert testimony or evidence to support his

10   claim that his elevated AST and ALT levels indicated a need for HCV medication.

11          Mere differences in judgment between a prisoner and prison medical personnel

12   about the appropriate medical diagnosis or treatment do not establish a deliberate

13   indifference claim; the plaintiff must show, by admissible evidence, that the prison doctor's

14   course of treatment was medically unacceptable and that it was chosen in conscious

15   disregard of an excessive risk to the plaintiff's health.  *Jackson*, 90 F.3d at 332.  Expert

16   testimony is not generally required to show deliberate indifference, especially in cases

17   where a layperson can understand the evidence.  *Reidhead v. Ariz.*, CV-12-00089-PHX-

18   JAT, 2014 WL 2861046, at *5 (D. Ariz. June 24, 2014) (citing *Sander v. York*, 446 F.

19   App'x 40, 43 (9th Cir. 2011) (deliberate indifference claim did not require expert

20   testimony)).  But here, where Plaintiff's claim hinges on the interpretation of lab results

21   and whether those results warranted HCV drug therapy, the evidence cannot be understood

22   without expert testimony or other type of medical evidence.  *See Fleming v. LeFevere*, 423

23   F. Supp. 2d 1064, 1070-71 (C.D. Cal. 2006) (expert testimony required where the basis of

24   deliberate indifference claim was inmate's disagreement with prison doctor's evaluation of

25   inmate as a "fairly poor candidate for treatment of Hepatitis C with Interferon at this time").

26          Plaintiff's disagreement with the medical staff's treatment decisions is not enough

27   to establish deliberate indifference.  Plaintiff's medical records, which include nearly a

28   decade of monitoring, do not suggest that he should be considered high priority for

1   treatment under the BOP Guidelines or that the decision to not consider him for HCV

2   treatment violated his constitutional rights.  Plaintiff failed to refute Defendants' evidence;

3   thus, there is no dispute of material fact.  Plaintiff is not competent to offer medical

4   opinions or to interpret medical test results.  *See* Fed. R. Civ. P. 56(e)

5       Based on the record before the Court, Defendants' evidence demonstrates that

6   Plaintiff's HCV has been consistently monitored and that the decision to withhold drug

7   therapy was warranted.  Plaintiff cannot show that this decision was unacceptable or that

8   it was made in conscious disregard of an excessive risk to his health.  Accordingly,

9   summary judgment will be granted to Defendants Ryan and Pratt in their individual

10   capacities.

11       Turning next to Plaintiff's official capacity claims, the Court will dismiss Defendant

12   Pratt in his official capacity for the same reason it dismissed Plaintiff's official capacity

13   claim against Defendant Schmid.  The Court will also dismiss Defendant Ryan in his

14   official capacity because there is no evidence that the HCV protocols adopted by the ADC

15   were medically unacceptable or amounted to a constitutional deprivation.

16       **E.    Defendant Corizon**

17       To prevail on a claim against Corizon as a private entity serving a traditional public

18   function, Plaintiff must meet the test articulated in *Monell v. Dep't of Social Services of*

19   *City of New York*, 436 U.S. 658, 690-94 (1978).  *See also Tsao v. Desert Palace, Inc.*, 698

20   F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of

21   state law).  Accordingly, Plaintiff must show that an official policy or custom caused the

22   constitutional violation.  *Monell*, 436 U.S. at 694.  To make this showing, he must

23   demonstrate that (1) he was deprived of a constitutional right; (2) Corizon had a policy or

24   custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's

25   constitutional right; and (4) the policy or custom was the moving force behind the

26   constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237

27   F.3d 1101, 1110-11 (9th Cir. 2001).  Further, if the policy or custom in question is an

28   unwritten one, the plaintiff must show that it is so "persistent and widespread" that it

constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

As an initial matter, the parties do not dispute that Corizon is not liable for any constitutional violations that occurred prior to Corizon becoming the ADC's contracted medical provider on March 4, 2013.  (Doc. 42 at 11; Doc. 53 at 8.)  Next, as discussed above, the record before the Court does not support a finding that Plaintiff's Eighth Amendment rights were violated or that the HCV protocols adopted by the ADC and Corizon amount to deliberate indifference.  Plaintiff has received frequent and consistent monitoring of his HCV, and he has remained in the low to intermediate priority range for treatment.  When Plaintiff briefly fell into the high priority range, additional testing was performed, and Plaintiff's APRI score went back to normal within a matter of weeks where it has since remained.  On these facts, Plaintiff has failed to refute Defendants' evidence that the Corizon medical staff has provided adequate treatment in the form of chronic care appointments and routine lab testing, and he has not shown that the policy adopted by Corizon was deliberately indifferent to his serious medical need.  Accordingly, summary judgment will be granted to Defendant Corizon.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 42) is **granted**.  The Clerk of Court must terminate the action with prejudice and enter judgment accordingly.

Dated this 26th day of September, 2019.

Honorable James A. Soto
United States District Judge